IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| GERARDO FLORES #1512080 | § | |
| VS. | § | CIVIL ACTION NO. 6:12cv1000 |
| DIRECTOR, TDCJ-CID | § | |

ORDER OF DISMISSAL

Petitioner Geraldo Flores, an inmate confined in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus challenging his Angelina County conviction for capital murder, in violation of the state laws of Texas. Petitioner was charged with two counts of capital murder and two counts of felony murder. CR at 6.[1] After a jury trial in which a guilty verdict was returned, Petitioner was sentenced to life in prison. The federal petition was referred to United States Magistrate Judge John D. Love, who issued a Report and Recommendation on March 7, 2016, concluding that the petition for a writ of habeas corpus should be dismissed with prejudice as time-barred. Petitioner, who is represented by retained counsel, timely filed objections to the Report and Recommendation. *See* Objection to Report and Recommendation (Docket Entry #29).

---

[1] "CR" refers to the Clerk's Record of papers filed in the trial court and followed by the page number. "SHCR" refers to the Clerk's Record of pleadings and documents filed with the court during Petitioner's state habeas corpus proceedings. *See* generally, *Ex parte Flores*, No. 72,019. Flores filed two state habeas applications. This Court will refer to each by "SHCR-01" and "SHCR-02." Each application contains multiple volumes, many of which are unnumbered. In referring to the SHCR, this Court will also refer to the "EventDate:" appearing on the outside cover and will also try to identify the cited document by title or some other identifying notation.

1

### *The Petition is Time-Barred*

Petitioner argues that he satisfied that AEDPA deadline by filing his state application for writ of habeas corpus within the one-year deadline of May 13, 2009. *See* Objections to the Report and Recommendation (hereafter "Objections") at 1. Petitioner filed a state writ of habeas corpus on April 7, 2009, but it was dismissed as "Noncompliant with Tex. R. App. P. 73.1" (TRAP 73.1) on May 20, 2009. *Id.* at cover. Petitioner then filed a second application on May 29, 2009. SHCR-02 at 1. The second application was denied on December 5, 2012. *See Ex parte Flores*, 387 S.W.3d 626, 629 (Tex. Crim. App. 2012).

Petitioner re-urges his argument that first state writ should toll the limits for the filing of his federal petition. A state habeas application is properly filed "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *See Artuz v. Bennett*, 531 U.S. 4, 8 (2000). These procedural laws and rules "usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Id.* Such requirements are often "conditions to filing," as opposed to requirements such as procedural bars that are "conditions to obtaining relief." *Id*. at 10. Federal courts look to state law to determine whether a state habeas application conforms to the state's procedural filing requirements. *Wion v. Quarterman*, 567 F.3d 146, 148 (5th Cir.2009).

Texas's procedural rules require that a state habeas application "must be made in the form prescribed by the Court of Criminal Appeals," *See* Tex.R.App. P. 73.1(a), (c). Under Texas law, compliance with the requirements of Rule 73.1 is a prerequisite to consideration of the merits of an applicant's claims. *Ex parte Blacklock,* 191 S.W.3d 718, 719 (Tex.Crim.App.2006). Therefore, compliance with the requirements is a "condition to filing" and not a "condition to obtaining relief."

*See Artuz,* 531 U.S. at 10. The Texas Court of Criminal Appeals dismissed Petitioner's first state writ as "Noncompliant with Tex. R. App. P. 73.1" (TRAP 73.1). The Texas Court of Criminal Appeals thus dismissed the application for failing to follow the state's procedural filing requirements. The Texas Court of Criminal Appeals makes the final decision whether the application complies with all filing requirements and whether to grant or deny the application. *See* Tex.Code Crim. Proc. Ann. art. 11.07. Because compliance with procedural filing requirements is a matter of state law, federal courts defer to the Texas Court of Criminal Appeals' determination that Petitioner failed to follow the filing requirements. Therefore, Petitioner's state habeas application was not "properly filed" and did not toll the AEDPA statute of limitations.

### *No Statutory or Equitable Tolling Applies*

Petitioner's federal petition was due no later than May 13, 2009, absent statutory or equitable tolling. Petitioner is not entitled to statutory tolling. While Petitioner filed his first application for a state writ of habeas corpus on April 7, 2009, that application was dismissed as "Noncompliant with Tex. R. App. P. 73.1" on May 20, 2009. SHCR-01 at 10, cover.[2] Petitioner states that he failed to use the correct form required by the Texas Rule of Appellate Procedure. *See* Objections at 1-2. A state-writ application dismissed on procedural grounds is not "properly filed" pursuant to 28 U.S.C. § 2244(d)(1)(D), thus, does not toll the limitations period. *See Artuz v. Bennett*, 531 U.S. 4, 8 (2000); *Wickware v. Thaler*, 404 Fed. App'x 856, 858-59 (5th Cir. 2010) (holding that a state writ dismissed pursuant to Tex. R. App. P. 73.1 was not "properly filed" within the meaning of § 2244(d)(1)(A));

---

[2]Petitioner did his own limitations calculation. *See* Amended Fed. Pet. at 8. His error was in tolling the period in which his first, state-writ application was pending. *See id.* (noting that there were "36" days remaining at the time he filed his first, state-writ application on April 7, 2009, and "36" days remaining after the first application was dismissed on May 20, 2009). An application dismissed on procedural grounds is not "properly filed," as indicated above.

3

*Davis v. Quarterman*, 342 Fed. App'x 952, 953 (5th Cir. 2009) (same). This Court will not second-guess the application of TRAP 73.1. *See Wion*, 567 F.3d at 148.

Petitioner did file a second application but did so on May 29, 2009, sixteen days after the limitations period expired on May 13, 2009. *See* SHCR-02 at 1. Since his second application was filed after the limitations period expired, it did not toll the limitations period. *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000) ("state habeas application did not toll the limitation period under § 2244(d)(2) because it was not filed until after the period of limitation had expired.").

Petitioner contends that the filing of his first, state-writ application tolled the limitations period for 43 days. *See* Amended Fed. Pet. at 8. He again attempts to distinguish *Wickware* and *Davis* in his objections by arguing that his circumstances differ from those in both those cases. In *Wickware*, the Fifth Circuit addressed two main issues: (1) whether the allegation that the petitioner was given the wrong form state-habeas application and whether the nine-month delay in dismissing the application were state-created impediments under 28 U.S.C. § 2244(d)(1)B), and (2) whether the petitioner was entitled to equitable tolling. *See Wickware*, 404 Fed. App'x at 859-863. There is no issue here about the delay in dismissing the application because the Court of Criminal Appeals dismissed Petitioner's petition in 43 days. Petitioner also admits he failed to use the correct form; thus, there is no issue concerning the form used.

*Wickware* does present an issue regarding equitable tolling. In finding that the petitioner was not entitled to equitable tolling the Fifth Circuit noted the petitioner waited eight months before filing the state-habeas application that was ultimately dismissed and another six months after the dismissal before filing his federal petition. *See id*. at 861-861. The court's ruling was based, in part, on the "unexplained" eight-month delay in filing the state-habeas application. *Id*. at 861. In this case,

Petitioner cannot explain the 329-day delay in filing his first application. Investigating his claims would not provide an adequate explanation. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998).

The petitioner in *Davis* faced the same two problems, non-compliance and lack of diligence. *See Davis*, 342 Fed. App'x. at 953-954. Petitioner does not argue problems with compliance; he is conflating compliance with diligence. This is an equitable tolling argument. The petitioner in *Davis* faced the same two problems, non-compliance and lack of diligence. *See Davis*, 342 Fed. App'x. at 953-954.

Consequently, absent equitable tolling, Petitioner's petition is untimely. Petitioner argues that he is entitled to equitable tolling. Petitioner argues, for the first time in his objections, that "the Court should guard against inadvertently allowing a family's poverty to influence its application of an equitable tolling provision....expecting a poor Mexican family to hire an experienced habeas corpus attorney quickly, which is quite expensive, raises concerns that the family and Petitioner are being penalized for their economic status, and if so, that would violate equal protection". *See* Objection at 5.

Because Petitioner failed to raise this argument before the Report and Recommendation, it is waived. *See, e.g., Cupit v. Whitley,* 28 F.3d 532, 535 and n. 5 (5th Cir.1994); *see* also *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–991 (1 st Cir.1988) (explaining that a party "has a duty to put its best foot forward" before the Magistrate Judge-*i.e.,* "to spell out its arguments squarely and distinctly"-and, accordingly, that a party's entitlement to de novo review before the district court upon filing objections to the Report and Recommendation of the Magistrate Judge does not entitle it to raise issues at that stage that were not adequately presented

5

to the Magistrate Judge). Further, Petitioner cites no authority for his proposition that the equal protection clause is implicated by his failure to meet the state procedural rules with his filing. Finally, the Fifth Circuit has long held that neither a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling. *See Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir.1991) (age discrimination case). It is irrelevant whether the unfamiliarity is due to illiteracy or any other reason. *Id*. "It is well-settled that equitable tolling is not warranted merely because a petitioner proceeds *pro se* and is not well versed in the law." *See Bishop v. Quarterman*, 2007 WL 1567095, at * 4 (S.D.Tex. May 29, 2007); see also *Felder v. Johnson*, 204 F.3d 168, 172 (5th Cir.2000). Likewise, neither an inmate's poverty nor trouble obtaining necessary records provides a basis for equitable tolling. *See Kiser v. Dretke,* 2004 WL 2331592 (N.D.Tex. Oct. 15, 2004), *Report & Recommendation adopted by* 2004 WL 2549174 (N.D.Tex. Nov. 9, 2004) ("Difficulty obtaining records and lack of money to pay for copies are common problems among inmates who are trying to pursue post-conviction habeas relief and, thus, do not present exceptional circumstances that warrant equitable tolling.").

### *Petitioner Cannot Meet the Actual Innocence Standard of McQuiggin v. Perkins*

Petitioner re-urges his argument that the "actual innocence" exception to the rules regarding time limits apply in his case and permit consideration of his petition. *See* Objection at 8. Petitioner's new evidence which he alleges supports his claim of actual innocence is an affidavit of medical expert, Dr. Harvey J. Kliman. This medical opinion was submitted by affidavit in the state record. Dr. Kliman reviewed the original cell tissue slides and medical examination reports and opined that Petitioner did not cause the death of the fetuses. Dr. Kliman theorized that the fetuses were genetically defective and the woman's body rejected them naturally through spontaneous

miscarriage. Dr. Kliman believed the slides clearly displayed certain cells that indicate serious genetic defects and that the medical records contained evidence that spontaneous abortion was already underway when Flores committed the assault.

The Supreme Court has held that "actual innocence, if proved, serves as a gateway through which the petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013). Thus, if Petitioner were to make a colorable showing of actual innocence, he could pass through the gateway and thereby avoid the operation of the statute of limitations. Tenable actual-innocence gateway claims are rare; a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Id*., *citing Schlup v. Delo*, 513 U.S. 298, 329 (1995); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met). The question thus becomes whether Petitioner's affidavit from medical expert Dr. Harvey J. Kliman amounts to "new reliable evidence" sufficient to meet the demanding *Schlup* standard. The Court finds that the evidence presented by Petitioner is neither new or reliable.

**A.    *Dr. Kliman's Opinion Is Not "New."***

As noted in the Report and Recommendation, the affidavit submitted by Dr. Kliman theorized that the fetuses were genetically defective and the woman's body rejected them naturally through spontaneous miscarriage. Dr. Kliman believed the slides clearly displayed certain cells that indicate serious genetic defects and that the medical records contained evidence that spontaneous

abortion was already underway when Petitioner committed the assault.[3]

Petitioner's argument does not rise to the level of new evidence or a new theory of causation. The genetic-abnormality theory was advanced at trial. The Court of Criminal Appeals noted that causation was the "central" issue at trial:

> Causation was a central contested issue at trial; both applicant and the State presented substantial testimony as to what caused the deaths. Three theories of causation were presented: (1) Applicant committed homicide by stepping on E.B.'s abdomen; (2) E.B.'s self-inflicted wounds caused the miscarriage; and (3) the fetuses died from a genetic abnormality.

*Ex parte Flores*, 387 S.W.3d at 630.

At trial, Petitioner called Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County, Texas, who studied under Dr. Kliman and who testified that the "premature birth could have been caused by a genetic defect." *See Id*. at 632. "Dr. Pustilnik, however, could not rule out the possibility that physical trauma caused the deaths." *Id*. Petitioner believes that Dr. Kliman would have ruled out the possibility that physical trauma caused the deaths. *See* Amended Fed. Pet. at 13-14, 27. ("his actions did not harm the fetuses at all. The fetuses died of an independent proximate cause: that they were genetically defective").

Dr. Pustilnik and Dr. Kliman have differing opinions regarding the same evidence. Petitioner acknowledges that Dr. Pustilnik and Dr. Kliman discussed the evidence, specifically, the "pathology slides" prior to trial:

> Steve Pustilnik was one of Dr. Kliman's former residents at Yale Medical School.

---

[3] Petitioner attached several news articles regarding the analysis of placentas in terms of evaluating the risk of developing autism spectrum disorders. These articles purportedly support his claim that a genetic anomaly caused the deaths of the twin fetuses, as opposed to the state's theory that he repeatedly stomped the pregnant woman in the stomach and caused the death of the fetuses.

> When Pustilnik became involved in this case, he called his former professor. The two men looked at the pathology slides. Dr. Kliman showed Pustilnik the multiple inclusions in the placentas and explained that these inclusions were the cause of the fetuses' demised. Kliman prepped Pustilnik what points needed to be made to the jury: that there was a sole cause of death – the inclusions. No other cause.

*See* Amended Fed. Pet. at 35. Dr. Pustilnik, though, "did not stick to the conclusions the two men had discussed while studying the pathology slides." *See Id*.

Petitioner fails to acknowledge that it is possible Dr. Pustilnik "did not stick to the conclusions the two men had discussed" because Dr. Pustilnik drew a different conclusion. Dr. Pustilnik referred to the "presence of trophoblastic inclusions." *Ex parte Flores*, 387 S.W.3d at 632. In Dr. Pustilnik's opinion, though, "trophoblastic inclusions may, but will not necessarily, result in genetic abnormalities . . . . 'when you see [trophoblastic inclusions] in a placenta, that placenta in the vast majority of cases has a genetic problem to it.'" *Id*. at 632 n.15 (emphasis added).

The jury also heard from the State's witnesses who addressed the genetic-abnormality theory. The jury heard from Dr. David Todd, who testified that "E.B had recent infarction [which] were about 24-48 hours old, and likely caused the death of the fetuses in utero." *Id*. at 630-631. He also "concluded that such infarction was consistent with blunt force trauma and not the result of any genetic defect."*Id*. at 631. Dr. Todd's opinion was supported by "Dr. Popek, a pediatric placenta pathologist at the Texas Children's Hospital[, who] agreed with Dr. Todd's assessment." *Id*. at 631 n.9. In short, the jury weighed the genetic-abnormality theory against the blunt-force-trauma theory and chose the latter. The jury, therefore, explicitly rejected Petitioner's genetic abnormality theory.

Dr. Kliman contends that his "testimony would have been much more definitive that these inclusions were a sign of a genetic abnormality that caused the miscarriage of these fetuses." SHCR-02 (EventDate: 09/04/2009) (Dr. Kliman's affidavit). As the Report and Recommendation notes, the

difference between Dr. Kliman's testimony and Dr. Pustilnik's testimony is a matter of degree and not substance. To qualify under the miscarriage of justice exception, evidence must be "'material, not merely cumulative or impeaching.'" *See Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998); *Lucas v. Johnson*, 132 F.3d 1069, 1076 n.3 (5th Cir. 1998); *see* also *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007) (holding that the *Schlup* standard not satisfied where ample evidence of guilt has not been discredited despite new expert opinion that conflicts with expert opinion provided at trial); *Boyde v. Brown*, 404 F.3d 1159, 1168 (9th Cir. 2005) ("the mere presentation of new psychological evaluations [not presented at trial] does not constitute a colorable showing of actual innocence"); *Bannister v. Delo*, 100 F.3d 610, 618 (8th Cir. 1996) ("putting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in *Schlup*).

Petitioner presented a transcript from Dr. Kliman's Statement Under Oath (SUO) given by Dr. Kliman in his home in Connecticut. *See* SHCR-02 (EventDate: 04/20/2012) at 111-241. Unlike Dr. Pustilnik's testimony, Dr. Kliman's opinion was offered without the benefit of cross-examination. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding new evidence in the form of affidavits inherently suspicious because statements "are obtained without the benefit of cross-examination and an opportunity to make credibility determinations."). Certainly, given the evidence adduced at trial and during the state-habeas proceeding, Dr. Kliman's testimony in the context of an adversarial proceeding would have been subject to rigorous and intense cross-examination.

### B. *Dr. Kliman's Is Not "Reliable."*

There are several medical experts who question the reliability of Dr. Kliman's opinion. The Court of Criminal Appeals cited the following evidence present in the state habeas trial court:

> Dr. Johnson, E.B.'s obstetrician, submitted an affidavit in the habeas proceeding stating that Dr. Kliman's statements were "factually inaccurate" and "full of what is

10

referred to in the literature as 'junk science.'" He argued that it was "appalling" that Dr. Kliman could be "so grossly negligent," and he described Dr. Kliman's statement that E.B. suffered bleeding "throughout the pregnancy" as misleading and inaccurate. Dr. Johnson criticized Dr. Kliman's attack on Dr. Todd's work and concluded that Dr. Kliman was clearly "biased and inaccurate." The State also submitted the affidavit of Dr. Edwina J. Popek, a professor of pathology at Baylor College of Medicine and the Director of Anatomic Pathology at Texas Children's Hospital. She reviewed some of the evidence in this case and noted that the slides of E.B.'s placenta did show the presence of trophoblastic inclusions, but that those inclusions did not indicate a genetic abnormality or cause the twins' premature births. She stated that Dr. Kliman's opinion is "considered to be outside the mainstream of placental pathology and could be fairly labeled as junk science." *Ex parte Flores*, 387 S.W.3d at 638 n.51.

It should be noted that Dr. Pustilnik, Dr. Kliman's protégé, disagreed with Dr. Kliman's conclusion. Another medical doctor, Dr. Johnson, the pregnant woman's obstetrician, referred to Dr. Kliman's opinion and methodology as "junk science," "appalling," "grossly negligent," "misleading," "biased and inaccurate," "considered to be outside the mainstream of placental pathology and could be fairly labeled as junk science". See *Ex parte Flores*, 387 S.W.3d at 638 n.51. There is evidence in the record, then, that goes further than saying Dr. Kliman was wrong; this evidence indicates that his opinion is unreliable. *See Ex parte Flores*, 387 S.W.3d at 638 & n.51.

C. *Assuming Dr. Kliman's Opinion Is "New" and "Reliable," Petitioner Has Not Proven That "It Is More Likely Than Not That No Reasonable Juror" Would Have Convicted Him.*

Petitioner has the burden to demonstrate that, in light of the new evidence, "'it is more likely than not that no reasonable juror would have convicted [him].'" *See McQuiggin*, 133 S. Ct. at 1933; *Schlup*, 513 U.S. at 329. To assess that question, this Court should evaluate "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility." *House*, 547 U.S. at 538. Next, the court should "assess the likely impact of the evidence on reasonable jurors." *Id*. Petitioner claims in his objections that the

11

Magistrate report "conflate[s] the *McQuiggins* actual innocence gateway analysis (which is subjected only to a preponderance of evidence standard) with an entirely separate analysis, that of a 2254(d) "reasonable application" analysis (which is subjected to a higher "deference" standard) to determine whether the state court's application of facts and law was reasonable". *See* Objection at 18.

Petitioner's claim that the Report and Recommendation relies on an incorrect standard is evidence is erroneous. On an actual innocence claim, "a petitioner must demonstrate two things.... First, a petitioner must present new, reliable evidence that was not presented at trial. *Schlup,* 513 U.S. [298,] 324, 115 S.Ct. [851,] 865, [130 L.Ed.2d 808 (1995) ]. Second, a petitioner must show by a preponderance of the evidence, 'that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' *Id*. at 327." *Houck v. Stickman,* 625 F.3d 88, 93 (3d Cir.2010). The court examines not just the new evidence but the old evidence as well. *House v. Bell,* 547 U.S. 518, 538 (2006). "[A]ctual innocence requires a showing of factual innocence, not mere legal insufficiency." *Sweger v. Chesney,* 294 F.3d 506, 523 (3d Cir.2002).

In this case, determining the "likely impact of the evidence on reasonable jurors" is simplified since the jury did hear evidence that the fetuses died as a result of genetic abnormalities. Petitioner is correct that the jury did not hear Dr. Kliman offer his opinion that there was no other cause for the death but genetic abnormalities, an opinion, as noted above, would have been subject to extensive cross-examination. The jury did hear, however, from Dr. Pustilnik, who advanced the genetic-abnormality theory but left open the possibility that blunt-force trauma could have caused these deaths. Dr. Pustilnik simply said what Dr. Kliman would have said if he had been confronted, namely, that stepping on the stomach of a woman in her twentieth or twenty-first week of pregnancy hard enough and long enough to cause bruising "side to side going all the way across the abdomen"

could kill twin fetuses. *See Ex parte Flores*, 387 S.W.3d at 630.

Given this hypothetical "battle of the experts," the jury would have looked to its own experience and reached the same verdict. Further, Petitioner's actual innocence claim was adjudicated on the merits in state court. While this Court's determination here is whether Petitioner can meet the actual-innocence exception to the time bar, this Court will defer to the findings and conclusions set out in the opinion by the Court of Criminal Appeals. *See Reed v. Stephens*, 739 F.3d 753, 772-773 (5th Cir. 2014) (relying on state court's determination when deciding whether petitioner can overcome bar); *see* also *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010), that "[w]here a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, [§] 2254(e)(1) requires that the state court's findings of fact not be casually set aside").

In order to prevail, Petitioner must provide new "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial". *See Schlup*, 513 U.S. at 316. The confidence of the jury's decision is not undermined by Dr. Kliman's opinion. In this case, the court is not persuaded that petitioner has made a sufficient showing of actual innocence to satisfy the requirements of *McQuiggin*. In fact, petitioner has made *no* showing of actual innocence. Petitioner, then, cannot meet the actual innocence exception to the statute of limitations.

Here, Petitioner's federal action was not timely filed. Further, Petitioner has not shown that he is entitled to the benefit of the equitable tolling doctrine. Because his petition is time-barred, his claims on the merits will not be considered. The petition for a writ of habeas corpus should be dismissed with prejudice as time-barred.

The Report of the Magistrate Judge, which contains his proposed findings of fact and

recommendations for the disposition of such action, has been presented for consideration, and having made a *de novo* review of the objections raised by the Petitioner to the Report, the Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore the Court hereby adopts the findings and conclusions of the Magistrate Judge as the findings and conclusions of the Court. It is accordingly

      **ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. A certificate of appealability is **DENIED**. All motions not previously ruled on are hereby **DENIED**.

**SIGNED this 29th day of March, 2016.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE